Please the court, Mr. Hicks. My name is Rick Potler. I'm from the law firm of Thompson-Coburn in St. Louis. And don't be a bit bashful about speaking up so everybody can hear. Yes, sir. I guess the lectern is as high as it goes. It goes no higher. Well, that's a penalty for being tall, if there is such a thing as being tall. I will be loud. Okay, very good. This is an ERISA case, and the controlling law is clear and undisputed. The parties in the district court are in agreement that the arbitrary and capricious standard of review applies. The issue before the court is whether Sun Life's interpretation of the preexisting condition provision in this applicable policy was arbitrary and capricious or not. In the words of controlling Eighth Circuit precedent, the issue is whether a reasonable person could have interpreted this provision as Sun Life did. Not that a reasonable person necessarily would have, but that he or she could have. The facts are undisputed as well. Mr. Kooten was the president and one of two co-owners of Property Solutions Group, LLC, a real estate company. In May of 2010, he had retinitis pigmentosa. He had had it for 20 years. It's a condition that progresses over time, leads to tunnel vision, and sometimes to total blindness. He knew he had retinitis pigmentosa, and to the extent he had it to such an extent that he could no longer drive at night, and he had great difficulty in reading. In fact, his ophthalmologist submitted a letter to Sun Life in which he stated that most of his patients who had retinitis pigmentosa to this extent would have claimed disability long ago. Mr. Kooten knew, however, in May of 2010, if he filed his claim for disability, he was limited to $1,000 a month in gross benefits. So what he did is rather than submit his claim in May of 2010, he purchased a new group insurance policy that became effective June 1st of 2010 for his company, and in September claimed to have become totally disabled as a result of his retinitis pigmentosa. And as a result of that, he hoped to collect $6,000 a month rather than $1,000 a month in maximum benefits. But this policy had a provision that was intended to prevent this type of scheme. It said that if you had received medical care, treatment, or services, or had taken a prescription drug or medicine within three months of June 1st, in that event, you're limited to the $1,000 a month that you had under the prior policy. This is a broad provision, and the parties agree that for the 10 years prior to June 1st of 2010, Mr. Kooten had been taking very high doses of vitamin A, about 15,000 units a day, five times what the average is supposed to be. He did this because his ophthalmologist directed him to do it. And his doctors closely monitored and supervised his taking this high-dosage therapy because there are significant health risks associated with it, especially to the liver. The parties also agree that this high-dosage vitamin A treatment is a treatment that is recommended by the National Eye Institute, and it is endorsed by numerous published medical literature. It's not going to cure retinitis pigmentosa. Its hope and expectation is that it will slow its progression. It's undisputed also that Sun Life had this file reviewed by an ophthalmologist who determined that high-dose therapy vitamin A, such as this gentleman was receiving, would generally be considered by ophthalmologists to be medical treatment. No one has ever criticized the credentials of that ophthalmologist, and no one submitted anything in the administrative record that would challenge or dispute that opinion from that ophthalmologist. So based upon these facts and this law, it is our position that it was not arbitrary and capricious for Sun Life to determine that Mr. Kooten, during the three months prior to June 1st of 2010, had in fact been receiving medical treatment so that his benefit should be limited to $1,000 a month, which Sun Life agreed that it would pay to him. We would submit to you that a reasonable person could read this preexisting condition provision exactly as Sun Life did. In fact, we would suggest to you that a reasonable person would have read it this way. But we need only prove the former, not the latter, in order for this court to affirm. So the court may be asking, why is it that the district court ruled against Sun Life and in favor of Mr. Kooten? I was going to ask that question. No, no, in all seriousness. Well, you'll go on and tell us why. Okay. The answer is because the court concluded that the word or must always be read as a disjunctive. And according to the district court, this rule of construction meant that the term medical treatment, services, or care had to have some meaning that was different from and other than taking prescribed drugs or medicines. And according to the district court, if taking prescribed drugs or medicines cannot be medical treatment, it only follows that taking non-prescription high dosage vitamin supplements can't be medical treatment. And therefore, Sun Life's interpretation was wrong. I will submit to you that the district court was in error for at least four reasons. First of all, it is not correct that the word or must always be read as a disjunctive. We cited in our brief numerous cases over a prolonged period of time, and most importantly, a case from this circuit in 2007 in which this court held that or did not necessarily have to be read as a disjunctive. And the court read the word or other than as a disjunctive in that case, which we cite in our brief. The district court made no mention of this authority. I'm going to submit to you that the very fact that this court could read the word or other than as a disjunctive is proof positive that a reasonable person may so read it, and that therefore it was not arbitrary and capricious for Sun Life to read the word or other than as a disjunctive. Second, as we explained in detail in our brief, the linchpin of the district court's opinion is particularly misdirected when you read this prior existing condition provision as a whole. The district court never noted the fact that this single paragraph uses the word or three times and never once does it use it as a disjunctive. If or must be read as a disjunctive, that would mean that medical care, medical treatment, and medical service are three distinct different things. And I don't believe that any reasonable person would so read it. It also means that the word prescription drug and prescription medicine must be two distinct and different things because they're separated by the word or. And I don't believe that a reasonable person would read that phrase to give two separate and distinct meanings to those two phrases. If a doctor prescribes penicillin, I believe that the typical person would understand and agree that that penicillin is both a prescribed drug and a prescribed medicine. But that could not be the case under the district court's reasoning. Moreover, I believe that if a lay person would understand that when that doctor prescribes the penicillin, he's not only given a prescribed drug or medicine, he's also giving medical treatment. And yet under the rationale of the district court, that determination would also be impossible. Third reason, the district court is in error. Even if one were to accept the presumption that the word or must always be read as a disjunctive, it does not follow in this case that non-prescription vitamin therapy could not be medical treatment. All that such an acceptance would mean is that a prescribed drug or medicine couldn't be medical treatment. It does not follow that a non-prescription therapy cannot yet constitute medical treatment. Indeed, one could logically conclude that by specifically distinguishing prescription drugs from medical treatment, but not similarly distinguishing non-prescription therapies or regimens from medical treatment, that the author specifically intended to include non-prescription therapies within the term medical treatment. Let's just walk through that analysis for just a moment. If you're writing this preexisting condition provision and you say, well, I want to make certain that I'm excluding people who are receiving prescription drugs and medicines, and you write the paragraph as you did, but you might say, not only do I want to preclude those people, but I also want to preclude people like Mr. Kooten who can't come in and get a windfall. And that way I'm going to do that by simply broadly interpreting the term medical treatment and saying, if you're going to see a doctor who's directing a course of action for you, who's monitoring and supervising and testing you to make certain that this therapy is doing good and not harm, that that is clearly medical treatment. The fourth reason that the court erred is that, as I told you at the outset, there was a board-certified ophthalmologist who gave the opinion that when an ophthalmologist prescribes this course of treatment, it is medical treatment. And that opinion was never refuted in any way, not his credentials, not the opinion. For instance, Mr. Kooten didn't submit another ophthalmologist opinion who said, no, that's not the case at all. So I believe that a plan administrator could reasonably rely upon that opinion of a board-certified ophthalmologist, and it would not be arbitrary and capricious for Sun Life to have done so. I devoted the last few minutes to explaining why the district court was incorrect in its interpretation, but I don't want that discussion to lead us astray. The district court's underlying error was that it substituted its readings for that of Sun Life for no reason other than the district court thought its interpretation was a better one. But this court and every other appellate court around the country has held that such a reason is not a sufficient reason for reversing the interpretation of an ERISA administrator when the arbitrary and capricious standard of review applies. It was error for the district court to impose its reading simply because it thought, albeit mistakenly, that its reading was better. It could impose that reading only if a reasonable person could not have read this paragraph as Sun Life did, and that threshold is in no way met. And so we would respectfully ask this court to reverse the judgment of the district court and to enter judgment on behalf of Sun Life. Thank you. Mr. Hicks, good morning. You may proceed. Thank you, Judge. Judges, may it please the court. We're essentially here today because Mr. Cutton took this vitamin, the vitamin that I bought at Walgreens, this weekend. It doesn't require a doctor prescription. There was no doctor prescription in this case. And that's actually opposing counsel makes a big deal about the dosages. This is actually twice the dosage that they mentioned in their brief, the 15,000 units a day. Essentially, this case is about one paragraph. This is an ERISA case, as opposing counsel mentioned. There's limited discovery in these cases, as you all know. And we get down to really just the interpretation of one paragraph. And in that paragraph, two clauses. In this case, there's no medical records for the relevant time period, which was three months prior to the effective date of the policy. He did see other doctors for other conditions, but nothing for his eyes. And on appeal, when I got onto this case, I thought Sun Life would try to make the argument that, well, vitamin A could loosely fall under some type of prescribed drug or medicine. And it was our shock that, no, they agreed. They said, no, it's not a prescribed drug or medicine. They came back and said, no, it's medical treatment. And I don't know how you can have medical treatment without anybody seeing a doctor. And the two phrases in the relevant paragraph make that clear. Received medical treatment, care, or services, including diagnostic measures. And then the second part, or took prescribed drugs or medicines. Sun Life already agreed there's no prescribed drug or medicine here. It's, in their opinion, medical treatment. And I would suggest to you that medical treatment involves seeing some kind of medical professional. This court, in the Brewer case, said and really created a federal common law. Well, counsel said he was instructed to take the vitamin A. There's no instruction by the ophthalmologist. Would you stand in front of the microphone, please? You disagree with that? I think the term was recommended. And he also said that this regimen was being followed by medical doctors because of the danger to the liver and other adverse effects. Well, if that's the case, I mean, this is twice. Do you agree with that? I think there's a study. He referenced a study from 93 saying there's potential. There could be potential damages. Well, no, the counsel's statement was that the ophthalmologist told him to take it for his RP condition and that while taking it he was being followed by medical doctors or one medical doctor who was following him, keeping track of the levels because of the danger of adverse effects on other systems. Is that an incorrect statement? I think it's correct insofar as it was recommended to him and there was a long course of him taking vitamin A. As far as blood work or keeping track of levels, no. Well, is this the equivalent of, say, Ocuvite, which I've been taking, although my ophthalmologist said it may help, it may not? Yeah, in the case, as a matter of fact, the doctor that opposing counsel refers to said, well, we need to follow up and see how is he taking this. And so they called up Mr. Cutton. He said, I'm taking it in ICAPS form, and it's right there in the record. And it's something I can take. It's something anybody can take. Well, we can take ibuprofen, too, but that has dangerous side effects, we're told, I guess, in the popular press at least. But if I'm taking that myself, am I receiving medical treatment as that's defined in the policy? Self-administered, I suppose. But is that the context? I guess it comes down to a question of context. And certainly the phrase received is passive. Somebody else is doing something to you. And receiving medical treatment, care, or diagnostic services certainly implies you're going somewhere, and a medical professional is ‑‑ Well, again, what does the record show? To what extent was he advised to take this by a medical professional? There was no prescription. It was just mentioned. I mean, if there was a prescription, then it would fall under the second clause, took prescribed drugs or medicine. What is the ICAP that you're holding there? It's got a little red identifier, some specialized part of the ICAP program. Right there. Right here? No, no, right, no, in red, up above in the middle, right there. I-vitamin and mineral supplement. And your position is that anybody can walk in off the street and buy this endlessly, no accounting. That's correct. No charting by the pharmacist, no reporting to a doctor, that sort of thing. Absolutely correct. I just bought this at Walgreens this weekend. I certainly don't have a prescription for it. And I think what's also clear is this point about having a medical professional give an opinion and define the terms. This court's already said if, you know, in a policy, let me get the direct language from the Brewster case, it would be improper and unfair to allow experts to define terms that were specifically written for and targeted towards laypersons. And Sun Life defined many terms in this policy. And when they wanted to define a term, they put it in all-caps letters. This term wasn't. So we have to take the language as an ordinary layperson. And I certainly consider myself an ordinary layperson, and I was shocked when they tried to define the term as medical treatment. Secondly, on this doctor's opinion, what the opposing counsel didn't say is, let me quote from the doctor, there's no proven efficacious treatment for retinitis pigmentosa. And that's in the joint appendix, page 302. So essentially they're saying, penalize my client because he's getting medical treatment, but essentially this medical treatment doesn't work is how I interpret that doctor speak. Essentially what the court was arguing, the court's logic, the district court's logic in their order was this. If prescribed drugs and medicine aren't considered medical treatment, then vitamin A, which is not even a prescribed drug or medicine, can't be considered medical treatment. And I submit to you that's the correct reasoning. Opposing counsel. I was struck by Judge Perry's statement about the doctor recommending vitamin A, which is akin to a doctor suggesting that somebody with digestive issues eat apples because they are high in fiber. My ophthalmologist suggested I might eat a lot of green vegetables, leafy vegetables. I suggest that their logic, every time you eat green, leafy vegetables, you're receiving medical treatment. That's the logical conclusion. Well, except I guess there's a difference between apples and drugs. Well, is this a drug? Call it what you will. It's not totally harmless. I mean, maybe it is. One more point. The opposing counsel wants to put some kind of sinister motive on my client's intentions here. And in the reply brief, he basically wanted to put the onus on my client to disclose that he had retinitis pigmentosa before he signed the policy. And I suggest to you, Joint Appendix, page 1157, is the application. And on this application, there's nowhere that he can even put any preexisting condition for himself or anyone else. Matter of fact, it doesn't even talk money. It just says, check the box for long-term disability. It doesn't say there was an increase, decrease, stay the same. And unfortunately, we can't prove through discovery the good intentions of his heart. We're stuck with the administrative record. And opposing counsel wants to make this into something other than a legal interpretation. Well, is it like going out to buy a Hales dorm policy while you see the clouds in the sky? Is that their argument? Well, I think so. I think it's like what I was thinking of is you buy a house in a floodplain, you go out and buy flood insurance because you know it's going to flood someday. However, isn't that concept a bit different because that's the whole purpose of the program. It's not trying to duck coverage. It's wanting to be very inclusive. It's done by the federal government. And that's the other thing is this preexisting cause is pretty loose. I mean, it's only looking at three months. As a matter of fact, if he has the policy for 12 months, they can't look at any of this. And we can be here for a different reason. I suggest to you that, well, let me just quote straight from the judge's order. If prescribed medication is not considered medical treatment, it would be internally inconsistent to say that vitamin supplements, which require even less medical intervention, would constitute medical treatment. And I suggest that that logic is sound. And to hold otherwise would open the door to all kinds of cases that wouldn't even really, I think, that some life couldn't even foresee. I see all three of you wear eyeglasses. I mean, now that's a prescription. You all had to have a, assuming they're prescribed eyewear, under their theory, under their logic, every time you put your glasses on, are you receiving medical treatment? I suggest that's not what Sun Life originally intended, and they're grasping at straws in this case. Unless there's any other questions, I submit the remainder of my time. I'd like to make three points, if I might. First, what Mr. Hicks has said is that the district court said, well, if prescription drugs can't be medical treatment, then vitamin supplements can't be. But what he ignores is the fact that that underlying premise is based solely upon the fact that or must always be a disjunctive. And I think that I've proven, and I didn't see any argument from him to refute, that that's simply not a viable position to take in light of Eighth Circuit precedent or, frankly, in common sense when you read this preexisting condition provision. Second of all, he argued that, well, he hadn't seen the doctor during those three months. But that's not what it says, see a doctor. Under his argument that if a diabetic sees somebody on July 1st and gets insulin but doesn't come back for four months, then he hasn't received any medical treatment during those four months, even though he's taken insulin every day. And I don't think that is the way any lay person would understand that phrase. And now I'd like to address Judge Woolman's question. He takes, I know what you said, Ossipet or something, which your doctor says might be good for your eyes. I take lutein because my doctor said, you know, it can't do any harm, maybe it does some good. Here's the reason that's not the same situation. You don't have a known medical condition. Your doctor didn't say, Judge Woolman, I want you to take Ossipet because you have XYZ. And the medical literature says this may help, but it does have some downsides you need to know about. Here, this gentleman had a known specific medical condition that he was going to an ophthalmologist for treatment for and being supervised. Well, I shouldn't have used my personal situation because I guess I have to disclose now that I do have incipient or whatever you want to call it, signs of macular degeneration. Everybody does, or at least I do too. But the fact is. What's the supervision? You said earlier that there were adverse side effects, possible damage to liver, whatever, and that this person was being supervised by a medical doctor. Yes. Did you mean that? Yes. Is that actually in the record? Well, here's what the record shows. And we've carefully avoided this question. Mr. Kooten has AIDS. He's being followed by Dr. Polutsky, who is his AIDS physician. And so Dr. Spurrier wrote Dr. Polutsky and says, I'm giving this vitamin therapy, and so what you will find is that Dr. Polutsky did blood tests every three months, tracking the liver function and a whole lot of other things, part and parcel as a part of the AIDS, but also that's why Dr. Spurrier wrote to him and said, I'm giving him this therapy. And he wrote to him, and you will find it on page 390 of the administrative record, which he wrote Dr. Polutsky, and then in the administrative record at 149, at 216, at 806, and numerous other places, you will see the three- and four-page blood results that were being taken every three months as a part of following the liver. And that's why Dr. Spurrier didn't need to do that. And then I would just read from the joint appendix at 431, is where Dr. Spurrier wrote that I recommended this therapy to him. I do it because of the National Eye Institute. There is evidence to believe that it won't eliminate progress or that use of the vitamin does not eliminate progressive vision loss, but in some individuals it may slow the rate of progression of the disease. And so that's why he's doing it. He's treating a known specific medical condition with the only thing that the National Eye Institute says is going to help. And if that's not medical treatment that a reasonable person could believe it to be, then I don't know what would be. Very well. Thank you, Your Honors. The case is submitted and we'll take it under consideration.